### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ONE GRAY SAMSUNG GALAXY S23 CELL PHONE WITH A RED SUPREME CELL PHONE CASE | CASE NO. __2:24-mj-95_____ |

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Matthew J. Voytek, a Special Agent ("SA") with the Bureau of Alcohol, Tobacco,

Firearms and Explosives ("ATF"), being duly sworn, depose and state the following:

### I.  INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a warrant under Rule 41 of

the Federal Rules of Criminal Procedure to search one gray Samsung Galaxy S23 cell phone

with a red supreme cell phone case ("the **TARGET DEVICE**"), as further described in

Attachment A, and to seize items described in Attachment B.

2.      I am a Special Agent with the ATF and have been so employed since June 2021.

I have attended formal training at the Federal Law Enforcement Training Center in Glynco,

Georgia, where I completed the Criminal Investigator Training Program.  I also attended the

ATF National Academy in Glynco, Georgia, where I completed Special Agent Basic Training.  I

have received training in the enforcement of various criminal statutes enacted in the Gun Control

Act of 1968 and the National Firearms Act of 1932.  I am presently assigned as a Special Agent

for the ATF Columbus Field Division, Columbus Group I Field Office.  Under 18 U.S.C. § 3051,

I am empowered to enforce the criminal laws of the United States.

3.      As a Special Agent, I have participated in many investigations involving federal firearms violations and narcotics trafficking. Through these investigations, I have employed various investigative techniques, including conducting electronic surveillance, using confidential informants, and making controlled purchases of firearms and narcotics. I have also participated in conducting physical surveillance and have executed multiple federal arrest warrants. I also know how to analyze information resulting from traditional record searches and reviewing case files. As a result of my training and experience, I am familiar with federal laws pertaining firearms and narcotics trafficking.

4.      I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation; from discussions with other ATF agents and other law-enforcement officers; and from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another special agent, law-enforcement officer, or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Throughout this affidavit, reference to "investigators" specifically refers to criminal investigators.

5.      This affidavit is intended to show that there is sufficient probable cause for the above-described search warrant and does not purport to set forth all my knowledge of, or investigation into, this matter. The facts and information contained in this affidavit are based on my personal knowledge, my training and experience, my interviews of various witnesses, including law-enforcement personnel who participated in this investigation, and my review of certain records and documents.

## II.  BACKGROUND ON CONTROLLED SUBSTANCES TRAFFICKING

6.      Federal law generally prohibits the manufacture, distribution, and dispensation of controlled substances—including methamphetamine—and the possession with intent to do any of those activities.  *See* 21 U.S.C. § 841(a)(1) and 841(b)(1)(C).  Federal law also prohibits conspiring to do any of the above.  *See* 21 U.S.C. § 846.

7.      I know based on my training, knowledge, and experience that individuals who unlawfully distribute controlled substances ("drug traffickers") commonly maintain their tools of the trade—including controlled substances, contraband, proceeds of drug sales, and records and documents related to their drug trafficking—within secure locations inside their residence and/or vehicles both for their ready access and to conceal them from law enforcement.

8.      More specifically, I know that drug traffickers commonly maintain both the source of their illicit gains (the controlled substances themselves) and the proceeds of their crimes, in the form of U.S. currency, on-hand to readily maintain and finance their illicit drug business.

9.      I also know that drug traffickers commonly maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances.  Likewise, I know that drug traffickers commonly maintain these books, records, receipts, notes, ledgers, etc., where they will have ready access to them, such as in their cell phones.

10.      I also know that drug traffickers commonly maintain addresses or telephone numbers in books, papers, or on electronic media, including on their cell phones or other portable electronic devices, which reflect the names, addresses, and/or telephone numbers of their associates and clients.

3

11.     I also know that drug traffickers often utilize electronic equipment such as cell phones and other portable electronic devices, computers, currency counting machines, and telephone answering machines to generate, transfer, count, record, and/or store information concerning their drug trafficking.

12.     I also know that drug traffickers often take or cause to be taken photographs and videos of them, their associates, their property, and their product.  Drug traffickers usually maintain these photographs and videos in their possession, commonly on their cell phones or other portable electronic devices.

### III.  BACKGROUND ON FIREARM TRAFFICKERS

13.     In my training and experience, firearm traffickers commonly leverage and promote their ability to sell firearms "without paperwork"—i.e., without the buyer having to complete ATF Form 4473 or undergo the background check through the NICS process described above, and without the FFL having to submit a multiple sales report (if applicable) to the ATF. Relatedly, the firearms sold by firearm traffickers are often diverted to the criminal market, as they are commonly purchased by individuals with criminal records or other disqualifying factors.

14.     In my training and experience, firearm traffickers commonly maintain records and documents related to their firearm trafficking within their cell phones.

15.     I also know that firearm traffickers commonly maintain books, records, receipts, notes, ledgers, money orders, and other papers—whether in digital or physical form—related to the purchase and resale of their firearms.  Likewise, I know that firearm traffickers commonly maintain these books, records, receipts, notes, ledgers, etc., where they will have ready access to them—for example, in their cell phones.

16.     I also know that firearm traffickers commonly maintain addresses or telephone numbers in books, papers, or on electronic media (cell phones, computers, etc.) which reflect the names, addresses, and/or telephone numbers of their associates and clients.

17.     I also know that firearm traffickers often take or cause to be taken photographs and videos of them, their associates, their property, and their firearm collections or inventories. Firearm traffickers usually maintain these photographs and videos in their possession and often do so on their cell phones and other portable electronic devices.

## IV.  BACKGROUND ON ILLEGAL FIREAM POSSESSION

18.     Federal law also generally prohibits individuals who have been convicted of a crime punishable by imprisonment for a term exceeding one year from possessing a firearm or ammunition.  *See* 18 U.S.C. §§ 922(g)(1) and 924(a)(8).

19.     I know that individuals who possess firearms and ammunition frequently utilize cell phones to take photographs and videos of themselves in possession of their firearms and ammunition.  These same individuals also utilize cellphones, to include calls, texts, and social media applications, to arrange the purchase and sale of firearms, ammunition, and/or firearm-related accessories.

20.     I also know from my training and experience that "cell phones and the services they provide are 'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society."  *Carpenter v. United States*, 138 S. Ct. 2206, 2220 (2018) (quoting *Riley v. California*, 573 U.S. 373, 385 (2014)).

## V.  PROBABLE CAUSE

21.     Based on the facts set forth in this affidavit, there is probable cause to believe that Gearld HARDEN has committed violations of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C)

(distribution of controlled substances); and 18 U.S.C. §§ 922(g)(1) and 924(a)(8) (being a felon in possession of a firearm) [collectively, the "**SUBJECT OFFENSES**"]. Furthermore, there is probable cause to search the **TARGET DEVICE** for evidence of those crimes and property designed for use, intended for use, or used in committing those crimes.

22. In August of 2023, an ATF Special Agent working in an undercover capacity ("ATF UCA") identified Gerald HARDEN as an associate to Buford LOWRY, who was then the target of a federal investigation into illegal firearm trafficking.

23. On August 22, 2023, the ATF UCA travelled to LOWRY's residence to purchase firearms from LOWRY. This transaction was recorded by a hidden audio/video device. While at LOWRY's residence, HARDEN arrived, and he sold the ATF UCA a Mossberg 500, 12-gauge shotgun (S/N: U408874) for approximately $300.00. HARDEN also provided the ATF UCA with approximately three grams of methamphetamine as a sampler for future drug sales that HARDEN claimed he could make, including Xanax and crack cocaine. As a result, the ATF Columbus Field Office commenced an investigation into HARDEN, who is a convicted felon.[1]

24. On October 13, 2023, the ATF UCA returned to LOWRY's house for another controlled buy of firearms. This transaction was also recorded by a hidden audio/video device. While at LOWRY's residence, LOWRY brokered the sale of two more firearms from HARDEN to the ATF UCA: (1) a German, MAK, 9mm pistol (S/N: H1726) and (2) a Glock GMBH, Model 22, .40 caliber pistol (S/N: BWBP410). The ATF UCA paid HARDEN $950.00 for these two firearms. At one point, the ATF UCA inquired how much an ounce of meth would cost, and HARDEN indicated it would cost $200.00.

---

[1] I have queried the Franklin County Clerk of Courts' Website and learned that Harden was convicted of a felony offense for felonious assault (F2) in Case No. 10-cr-3808. Judgment was imposed for that conviction on or about March 21, 2011.

25.     As part of this investigation, I queried ATF databases and learned that HARDEN does not possess a Federal Firearms License ("FFL") as required to engage in the business of dealing in firearms, nor did he possess an FFL at any time relevant to this investigation.

26.     As a result of HARDEN's actions, the Grand Jury for the Southern District of Ohio returned a three-count indictment against him in Case No. 2:24-cr-004 on January 9, 2024. There, the Grand Jury charged HARDEN with two counts of being a felon in possession of a firearm and one-count of distribution of methamphetamine.  A warrant issued for his arrest.

## VI.  NEXUS BETWEEN HARDEN AND THE TARGET DEVICE

27.      On or about January 31, 2024, ATF Investigators arrested HARDEN at the Franklin County Court of Common Pleas in connection with the warrant referenced above. During the execution of that arrest warrant, investigators recovered the **TARGET DEVICE** from HARDEN.

28.     When asked by ATF investigators if the cell phone recovered belonged to him, HARDEN acknowledged and said it was his cell phone.

29.     The **TARGET DEVICE** was taken into custody at that time and has been in law enforcement custody ever since.  ATF has continued investigating HARDEN and others who are engaged in a conspiracy involving illegal firearms and narcotics trafficking.

30.      The **TARGET DEVICE** is currently in storage at 230 West Street, Suite #300, Columbus, Ohio.  In my training and experience, I know that the **TARGET DEVICE** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **TARGET DEVICE** first came into the possession of the ATF.

## VII.  THE TARGET DEVICE'S RELATIONSHIP TO THE ALLEGED CRIMINAL ACTIVITY

31.    HARDEN used the **TARGET DEVICE** to facilitate multiple sales of firearms that he was prohibited from possessing by federal law.  For example, on August 22, 2023, HARDEN pulled out the **TARGET DEVICE** and provided video footage of the Mossberg 500 shotgun that he was selling to the ATF UCA, saying: *"…Look video evidence for you right here…"*  HARDEN then displayed a video on his cellphone which showed HARDEN driving a car and shooting the provided Mossberg shotgun out the driver side window as the car moved at a high rate of speed.  As the discussion continued, HARDEN described additional firearms and ammunition that he had elsewhere and displayed pictures from this phone to the ATF UCA.  In addition, HARDEN provided the ATF UCA with his phone number to facilitate future methamphetamine deals after providing the ATF UCA with a sample of approximately three grams of methamphetamine.

32.    Finally, I know through training and experience that cell phones are commonly used, or have a relationship to, unlawful acts such as those described in this affidavit.  For example, I know that cell phones are commonly used to communicate the sale of drugs, firearms, and other unlawful contraband, and that cell phones can be used for other actions HARDEN may have taken in furtherance of his criminal activity.

## VIII. TECHNICAL TERMS

33.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land

line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.       Digital camera: A digital camera is a device that records still and moving images digitally. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.       Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store any digital data, such as word processing documents, even if the device is not designed to access such files. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable

storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.      GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive email. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers.

10

For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device. ·

g.      IP Address: An Internet Protocol address ( or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97 .178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static-that is, long-term-IP addresses, while other computers have dynamic-that is, frequently changed-IP addresses.

h.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

34.     Based on my training, experience, and research, I know that the **TARGET DEVICE** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## IX.   ELECTRONIC DEVICES AND STORAGE

35.     As described above and in Attachment A, this application seeks permission to search and seize things that the **TARGET DEVICE** might contain, in whatever form they are

11

stored.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Even when a user deletes information from a device, it can sometimes be recovered with forensics tools.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

36.     Searching for the evidence described in Attachment A may require a range of data analysis techniques.  In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law-enforcement searches for information.  These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment A, or perusing all stored information briefly to determine whether it falls within the scope of the warrant.  In light of these difficulties, the ATF intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment A.

## X.  CONCLUSION

37.     Based on the forgoing, I believe that there is probable cause to issue a search warrant for the **TARGET DEVICE**, more particularly described in Attachment A, and to seize the items described in Attachment B, as those items constitute evidence of the **SUBJECT**

**OFFENSES** or property designed for use, intended for use, or used in committing the

**SUBJECT OFFENSES**.

38.     *Manner of execution.*  Because this warrant seeks only permission to examine a

device already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the

Court to authorize execution of the warrant at any time in the day or night.

Respectfully submitted,

*Matthew J. Voytek IV*

Matthew Voytek, Special Agent
Bureau of Alcohol, Tobacco, Firearms,
and Explosives

Sworn to before me and signed in my
presence and/or by reliable electronic means
this  20th  day of February 2024.

Kimberly A. Jolson
United States Magistrate Judge